# CASES DECIDED

## IN THE

# Supreme Court of Appeals

## OF VIRGINIA

### 𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫.

## MUMPOWER ET ALS *v.* CASTLE ET ALS.

### September 16, 1920.

1. DEEDS—*Delivery*—*Deed Found Among Grantor's Papers at His Death.*—*Case at Bar.*—A deed duly acknowledged for recordation was found at his death among the private papers of the grantor, conveying a tract of land to the grantor's wife and the heirs of the grantor. The grantor retained possession of the land until his death, did not disclose to his wife or to any of the other beneficiaries during his lifetime that he had executed the deed, retained control of the deed until his death, and made no declaration that he intended to convey or had conveyed the land.

   *Held:* That the evidence negatived the conclusion that the signing, sealing, and acknowledgment of the deed were intended by the grantor to complete the transaction in so far as he was concerned, so as to make the deed operative *inter vivos.* The only intention of delivery by him which could be inferred, is that he intended the deed to become operative upon his death.

2. DEEDS—*Delivery*—*Death of Grantor.*—There can be no delivery of a deed by a dead hand. A deed, as such, must operate, if at all, *inter vivos.*

3. DEEDS—*Wills*—*Deed Operating as a Will*—*Case at Bar.*—If executed in accordance with the statute of wills, a deed may operate as a will, if it be intended by the party making it to take effect only after his death. But the deed in the instant case was not so executed, and hence, although testamentary in character, it cannot be given effect as a will.

1

Syllabus.

4. DEEDS—*Wills—Deed Operating as a Will.*—One cannot dispose of his property by deed, executed according to the forms ·of law, but which the maker retains in his possession and control, intending that it shall not operate until his death, or that it shall be delivered at his death.

5. DEEDS—*Delivery—Delivery Where Grantor Retains Possession of Deed.*—The mere facts that the grantor retains the deed in manual possession and that the grantee was not present and even did not know of the existence of the deed at the time, do not prevent the delivery of the deed, where there are acts of the grantor which evidence that the instrument is completed so far as he is concerned; that he intends it to operate presently; and the deed is beneficial to and is afterwards accepted by the grantee, although it may never come into the manual possession of it.

6. DEEDS—*Delivery—Delivery Where Grantor Retains Possession of Deed.*—The acts of the grantor referred to in the preceding syllabus may consist in part of declarations, and this rule permitting such constructive delivery is often applied to deeds in favor of infants and other persons who from the nature of the case cannot be expected to be present or in any wise participating in the transaction at the time of the delivery of the deed. And the prevailing view seems to be that the same rule is applicable to all deeds beneficial to the grantee, where the evidence shows that the grantor has parted with all right of control of the deed and intends that it shall operate presently to pass title.

7. DEEDS—*Delivery—Acknowledgment as Evidence of Delivery—Case at Bar.*—The acknowledgment of the deed in question by the grantor in the instant case could not be given the effect of *prima facie* evidence of the delivery of the deed, for the reason that the grantor retained possession of the supposed deed without any declaration or other evidence of his intention as to delivery, and the act of acknowledgment is not of such character as to rebut the natural inference which flows from the act of· a grantor in retaining a deed, to-wit, the inference that it is retained because no purpose of the grantor exists at the time to deliver it; and there is no other evidence in the case to rebut such inference.

8. DEEDS—*Delivery—Presumption of Delivery—Voluntary Settlement—Case at Bar.*—Although there is a strong presumption of the delivery of a deed of voluntary settlement, such presumption is but *prima facie.* Delivery of a deed of voluntary settlement is as essential to its validity as is the delivery of any other deed; and the acts of a grantor which are essential to a

delivery must be performed in his lifetime. In the instant case the circumstances negative and overcome any presumption that a delivery was intended. or was made by the supposed grantor in his lifetime.

9. DEEDS—*Delivery—Undelivered Deed as Contract to Convey—Statute of Frauds.*—An undelivered deed can only be given effect as a contract to convey where there is some evidence *aliunde* that there was a meeting of the minds of the grantor and grantee in a completed contract, the terms of which are expressed in the deed.

10. DEEDS—*Undelivered Deed—Contract to Convey—Implied Trust.*—An undelivered deed cannot be supported as a contract to convey by the implied or constructive contract which is involved in an implied or constructive trust, which arises by implication of law, where the terms of the contract expressed in the deed are different from the terms of the contract or trust which the law implies or raises.

11. TRUSTS AND TRUSTEES—*Implied Trust—Purchase Money Supplied by Another Than Grantee.*—Where the purchase money for land was paid with property belonging to the wife of the grantee and her children by a prior marriage, the relationship of the parties not being such that there was any legal or moral obligation on the wife or the children to make any gift or advancement to the grantee, and there being no evidence even tending to' show that there was in fact any gift to him, a trust arises by operation of law, in favor of the wife and children, from the mere fact of such use of their property; and this irrespective of whether or not there was an express prior agreement that the title to the land was to be taken in the name of the wife and children.

12. TRUSTS AND TRUSTEES—*Implied Trust—Constructive Trust.*—Where the purchase money of land is furnished by another than the grantee, if there was no prior agreement between the grantee and the party furnishing the purchase money that the title to the land was to. be taken in the name of such party, an implied trust arises in favor of the party furnishing the purchase money. If there was such prior agreement, making the taking of the title in his own name by the grantee tortious, a constructive trust arises.

13. TRUSTS AND TRUSTEES—*Implied Trust—Party Furnishing Part of Purchase Money.*—Where two or more persons together advance the price of property, and the title is taken in the name of one of them, a trust will result in favor of the other in respect to an undivided share of the property proportioned to his share of the price. The doctrine in all of its phases applies alike to personal and to real property.

Appeal from a decree of the Circuit Court of Washington county. Decree for complainants. Defendants appeal.

*Reversed and remanded.*

This is a suit in equity for the sale of certain land for partition. The appellees were plaintiffs in the court below and are the children of Mrs. M. E. Castle, deceased, by her second husband, Wm. A. Castle, also deceased. Both Castle and wife died intestate. The appellees will be hereinafter referred to as the Castle children. The appellants were defendants in the court below and are the children of Mrs. Castle by a former husband, Robert Mumpower, deceased, who died intestate, and the descendants of certain of such children who also died intestate. The appellants will be hereinafter referred to as the Mumpower heirs.

The material question involved is whether the land belonged wholly to Wm. A. Castle at the time of his death, which occurred in 1899; or whether Mrs. Castle and the Mumpower heirs owned an interest in such land.

The land was bought either by Wm. A. Castle, or by him and his wife, in two separate parcels, aggregating the supposed quantity of forty acres. The first parcel, supposed to contain thirty acres, was bought about the year 1880. The second parcel was bought some time later, the exact time not appearing in evidence, but not later than 1894. The land was of small market value when bought and was paid for wholly with personal property, the greater portion of which was derived from the estate of Robert Mumpower and belonged in the proportion of one-third to Mrs. Castle and two-thirds to the Mumpower descendants then living, as distributees of Robert Mumpower's estate. There was also one calf so used which belonged to Mrs. Castle alone.

Wm. A. Castle and his wife were married on February 17, 1878, so that Mrs. Castle had the right to hold her one-third interest in said personal property under the married woman's Act of April 4, 1877 (Acts 1876-7, p. 333).

· The testimony for the Mumpower heirs is to the effect that the thirty acre parcel of land was paid for with a horse, a ·heifer, nine sheep, two hogs, and probably two calves also, all of which belonged to Mrs. Castle and the Mumpower descendants then living, derived from the estate of Robert Mumpower, except two sheep and two hogs, which belonged to Wm. A. Castle. That the ten-acre parcel of land was paid for with a horse, which was obtained in a trade of two oxen, which were raised on the thirty acre tract of land from calves, one of which belonged, from its birth, to Mrs. Castle, and the other was bought at the price of $5.00. The evidence does not disclose whether Castle or his wife paid this $5.00; but in view of the evidence in the case that the latter was a hard working and industrious woman with earning power also as a midwife and the state of the evidence as to the earning capacity of the husband, the inference is that this $5.00 was paid by the wife.

There is no testimony for the Castle children which at all impeaches the correctness of the testimony aforesaid for the Mumpower heirs as to the ownership of said personal property. The only attempt to impeach it consists of the testimony of one of the Castle children in which he states in his testimony in chief that the horse used to pay for the ten acre parcel of land belonged to Wm. A. Castle, but on cross-examination he admits the the horse was obtained in a trade of a yoke of oxen which he further admits he supposes were "raised there on the place," and this is all he says on the subject.

There is no testimony for the Castle heirs which shows that Wm. A. Castle owned any other property than the two sheep and the two hogs aforesaid; or that he was industrious or frugal, or accumulated anything in any way.

The evidence fixes no value on the respective items of personal property aforesaid, except the horse used in the pur-

chase of the thirty acre parcel of land.  Such horse is shown by the evidence to have been worth $95.00.

The evidence tends to show that the personal property belonging to Mrs. Castle and the Mumpower descendants used in the purchase of the land was so used with the prior understanding and agreement between Castle and his wife that the conveyances of the land were to be made to her and her children.  The evidence as to such agreement consists of the testimony of one of the Mumpower children to the effect that he heard Wm. A. Castle and his wife talking about buying the land involved in this suit and that it was agreed between them that they would buy the land; that the personal property aforesaid which was afterwards used to pay for the land should be so used; and that when paid for the land was to be conveyed to Mrs. Castle and her children.

This testimony stands uncontroverted and unimpeached in the record.  The conversation, however, about the recollection of which this witness testified, occurred some thirty years before his testimony was given.

But, whether there was the previous agreement aforesaid or not, the evidence in the case leaves no room for doubt that the personal property was owned as aforesaid and that it was used to pay for the land as aforesaid.

However, as a matter of fact, both parcels of the land, when paid for as aforesaid, were conveyed to Wm. A. Castle and the land stood of record in his name at the time of his death.

Castle and his wife and the two sets of children lived upon the land as their home and it was thus in the joint occupancy and possession of Castle and his wife until Castle's death.

The evidence does not disclose when Mrs. Castle or the Mumpower descendants first learned that Wm. A. Castle had taken the conveyance of the land in his own name.

There is testimony, however, which tends to show that Mrs. Castle, when she learned that the land had been conveyed to the husband instead of to herself and children, was not satisfied with its standing in that way and that prior to 1894 the husband executed some sort of a deed of conveyance of the land to her, which however was not satisfactory to her and she declined to accept it.

Thus matters stood until the death of Wm. A. Castle. A few days after his death a brother of his, in looking over his private papers in the presence of Mrs. Castle, found the following instrument in writing, duly acknowledged for recordation as appears from the certificate of the justice:

"This deed made this October 1, 1894, between Wm. A. Castle of the first part and M. E. Castle of the second part all of the county of Washington and State of Virginia, Witnesseth: That for and in consideration of the sum of one hundred and fifty dollars the receipt of which is hereby acknowledged, the party of the first part bargains, sells and conveys unto the party of the second part a certain tract of land lying in Washington county, Va., on Tools creek adjoining the lands of B. C. Bailey, N. K. White and others and containing forty acres be the same more or less and bounded as follows: Beginning at a corner on an apple tree above the road and running *strait* into a hollow thence with the hollow to top of ridge thence with line established by White and Bailey to *pools* Bars thence with gulf hollow branch to a sugar tree marked as a corner, thence a straight line a west course to top of a ridge to a white oak on N. K. White's line as a corner thence with N. K. White's line to a stump on B. C. Bailey's line as a corner thence with B. C. Bailey's line to Tools creek, thence up Tools creek with east bank of public road to mouth of gulf hollow branch thence up gulf hollow branch to corner of a one acre lot thence around said lot to Tools creek thence with meanderings of creek to first corner, thirty acres of this land was

purchased by W. A. Castle of C. M. D. Bailey and his wife, ten acres of Wm. Rouse by said Castle, to have and to hold the said tract or parcel of land unto the M. E. Castle—her assigns and the heirs of Wm. A. Castle or their assigns forever.   And the party of the first part warrants generally the land hereby conveyed.   Witness the hand and seal of the party the day and year first above written.

                    "WM. A. CASTLE   (Seal).
"State of Virginia, County of Washington, to-wit:

"I, D. W. Kistner, a justice of the peace in and for the county of Washington and State aforesaid, do certify that Wm. A. Castle whose name is signed to the above deed bearing date on the 1st day of October, 1894, personally appeared before me in my county and acknowledged the said writing.

"Given under my hand this ...... day of Oct., 1894.
                    "D. W. KISTNER, J. P.

"Virginia:  In the clerk's office of the County Court of Washington county, the 12th day of July, 1899.

"The foregoing deed was delivered to the clerk of the county court aforesaid on the day above mentioned and admitted to record.

          Teste: "A. R. BLACKWELL, D. C.
    "A Copy Teste:  S. A. SUMMERS, Deputy Clerk."

On finding this writing the brother asked Mrs. Castle if she previously knew of its existence.   She replied that she did not previously know that her husband "had made the deed."   Thereupon they both read the writing and the brother turned it over to her and she the next day, to-wit, on July 12, 1899, had it recorded, as appears from the certificate of the clerk copied above.

Thereupon Mrs. Castle entered into exclusive possession of the land under such writing and remained in such possession until her death in 1916.

This suit was instituted in 1917.

The evidence discloses no consideration for said deed except the interest of Mrs. Castle and the Mumpower heirs in the personal property used in paying for the land as aforesaid.

The chief issues made by the pleadings in the case are two, namely:

1. Whether there was a delivery of the writing above copied, of date October 1, 1894, so as to make it operative as a deed; and if not,

2. Whether the land in controversy was impressed with a trust in favor of Mrs. Castle in her lifetime and the Mumpower heirs to the extent that the land was paid for with their property.

The decrees under review held that the writing aforesaid, of date October 1, 1894, was never delivered and was therefore ineffective; that Wm. A. Castle died seized and possessed of the land as the owner thereof, and decreed its sale for partition among the Castle heirs, to the exclusion of the Mumpower heirs. The decrees do not specifically pass upon the second issue above mentioned, but do so in effect and adversely to the Mumpower heirs.

*Jno. J. Stuart* and *S. B. Campbell,* for the appellants.

*Hutton & Hutton* and *L. P. Summers,* for the appellees.

SIMS, J., after making the foregoing statement delivered the following opinion of the court:

The material questions presented for our decision by the assignments of error will be disposed of in their order as stated below.

1st. Was there a valid delivery of the deed of date October 1, 1894, which is involved in this cause, so as to make

it effectual and operative as a deed of conveyance of the land mentioned therein and purported to be conveyed thereby?

We are of opinion that this question must be answered in the negative.

The supposed grantor, Wm. A. Castle, left among his papers at his death, the supposed deed signed, sealed and acknowledged for record ready for delivery, but we look in vain for any evidence in the case of any delivery during his lifetime.

[1] It is true that the Castle children, who were all infants at the date of the supposed deed, were named therein as beneficiaries, as well as Mrs. Castle; but such children were to take no interest under the deed in the lifetime of the grantor—they were to take as his heirs, and, hence, upon his death. Moreover, the grantor in fact retained his possession of the land until his death; did not disclose to Mrs. Castle or to any one of the other beneficiaries, during his lifetime that he had executed the deed; retained the manual possession, and the dominion and control of the deed until his death. So far as the evidence in the case discloses he at no time made any declaration that he intended to convey or, after the execution of the supposed deed, that he had conveyed the land as the supposed deed would have conveyed it had the deed been delivered. This silence was not broken by the leaving of any statement, such, for example, as a will, to speak upon the subject of his intention at the time he executed the supposed deed, for he died intestate. (See *Payne* v. *Payne, post,* p. 33, 104 S. E. 712, decided at this term of court for a case of declaration of intention to deliver contained in a will, the declaration being of such intention existing at the time the deed was executed). These circumstances convince us that it was not the intention of the grantor in the case now before us that the deed should be delivered and become operative as a conveyance in his lifetime. The evidence negatives the conclusion that the

signing, sealing and acknowledgment of the deed by the grantor were intended by him to complete the transaction in so far as he was concerned, so as to make the deed operative *inter vivos*. The delivery for which he had the deed ready was postponed until death overtook him. Hence the only intention of delivery by him which we can infer, which is consistent with the preponderance of the evidence, if there can be an inference of any fixed and definite intention on his part on the subject, is that he intended the deed to become operative upon his death.

Now, it is true, as stated in 8 R. C. L. section 47, pp. 976-7 that "There is no universal test, applicable to all cases, whereby the sufficiency of delivery can be determined, and it is impossible to state in exact terms what shall or shall not constitute a delivery; wherefore, whether the facts relied on to establish a delivery in a particular case are sufficient for that purpose is often a difficult question. Indeed, it has well been said that an arbitrary rule ought not to be laid down." But from the text writers and the numerous reported cases on the subject we find that certain cardinal rules have been established whereby we are enabled to determine without great difficulty whether the deed has or has not been delivered in a case such as that before us.

[2] For example: As is said in substance by a number of the authorities, there can be no delivery of a deed by a dead hand. A deed, as such, must operate, if at all, *inter vivos*.

[3] It is true that if executed in accordance with the statute of wills a deed may operate as a will, if it be intended by the party making it to take effect only after his death. *Pollock* v. *Glassell*, 2 Gratt. (43 Va.) 439, 455. But the deed in the present case was not so executed and hence, although testamentary in character, it cannot be given effect as a will.

[4] As said in 8 R. C. L. section 55, p. 988: "While by limitations predicated on the grantor's death a deed may

be assimilated to a will, and thus, or otherwise, as where there is a delivery to a third person during the grantor's lifetime, its operation may be suspended until the grantor's death, a deed cannot be made to perform the functions of a will * * *. One cannot, therefore, dispose of his property by deed, executed according to the forms of law, but which he retains in his possession and control, intending that it shall not operate until his death, or that it shall be delivered at his death." See to same effect, 1 Devlin on Deeds, section 260, 260-a, 269, 278-a, 279, 279-a.

[5, 6] It is true that the mere facts that the grantor retains the deed in his manual possession and that the grantee was not present and even did not know of the existence of the deed at the time, do not prevent the delivery of the deed, where there are acts of the grantor which evidence that the instrument is completed so far as he is concerned; that he intends it to operate presently; and the deed is beneficial to and is afterwards accepted by the grantee, although it may never come into the manual possession of the latter. 2 Minor's Inst. (3rd ed.) 732-3; 8 R. C. L. section 51, p. 982; *Leftwich* v. *Early,* 115 Va. 323, 79 S. E. 384. The acts of the grantor referred to may consist in part of declarations, and this rule permitting such constructive delivery is often applied to deeds in favor of infants and other persons who from the nature of the case cannot be expected to be present or in any wise participating in the transaction at the time of the delivery of the deed. And the prevailing view seems to be that the same rule is applicable to all deeds beneficial to the grantee, where the evidence shows that the grantor has parted with all right of control of the deed and intends that it shall operate presently to pass title. 1 Devlin on Deeds, sections 286-289. In such cases, while the manual possession of the deed remains with the grantor after the constructive delivery has taken place, he has parted with the *right* of possession and with the *right* of dominion

and control of the deed; and although he has the physical opportunity and the power thereafter to destroy the instrument, that is immaterial since he has not the *right* to do so; and such action would, indeed, be of no effect, since the deed would have become effectual upon the instant of the constructive delivery and would have passed the title beyond the power of the grantor to recall it and reinvest himself with it. It is in this sense that the authorities lay down the universal rule that one essential element of every delivery of a deed is that the grantor must have parted with the dominion and control of it. 8 R. C. L. section 53, p. 985; 1 Devlin on Deeds, sections 250-a, 261.

Precisely what acts of a grantor will be sufficient to evidence the constructive delivery just mentioned in all cases, it would be, as aforesaid, impossible to state; and it would be needless for us to develop in the case before us with any detail of discussion, in what cases in our opinion the acknowledgment of a deed by the grantor alone would or would not of itself furnish *prima facie* evidence of its delivery, since, as above stated, we think that the other evidence in the case would overcome any such *prima facie* evidence, even if such *prima facie* effect could be given to the acknowledgment in the present case, and would establish the fact that the grantor did not intend to deliver the supposed deed in his life time.

[7] Lest our meaning in what we have just said be misunderstood, however, we will say that we do not think that the act of acknowledgment could be given the effect of *prima facie* evidence of the delivery of the deed in the case before us, for the reason that in such case the grantor retained possession of the supposed deed without any declaration or other evidence of his intention as to delivery, and the act of acknowledgment is not of such character as to rebut the natural inference which flows from the act of a grantor in retaining a deed, to-wit, the inference that it is retained be-

cause. no purpose of the grantor exists at the time to de-
liver it; and there is no other evidence in the case to rebut
such inference. No authority has been cited before us nor
have we found any which holds that an acknowledgment of
a deed for record by the grantor alone has the effect of such
*prima facie* evidence in a case such as that before us. See
1 Devlin on Deeds, section 294; 2 Minor on Real Prop., sec-
tion 1142; *Hutchison* v. *Rust,* 2 Gratt. (43 Va.) 394; *Kille*
v. *Ege,* 79 Pa. St. 15; *Diehl* v. *Emig,* 65 Pa. St. 320; *Boyd*
v. *Slayback,* 63 Cal. 492; *Alexander* v. *DeKermel,* 81 Ky.
345; *Pollock* v. *Glassell,* 2 Gratt. (43 Va.) 439; 1 R. C. L.
section 23, p. 261; *Seibel* v. *Rapp,* 85 Va. 28, 6 S. E. 478;
*Farrar* v. *Bridges,* 5 Humph. (24 Tenn.) 411; 42 Am. Dec.
439; *Howe* v. *Ould,* 28 Gratt. (69 Va.) 1, 11; 8 R. C. L. sec-
tion 69, pp. 1009-1010; and also 8 R. C. L. section 47, pp.
976-7, section 57, p. 982; 1 Devlin on Deeds, sections 260-a,
269, 278-a, 279, 279-a cited above.

But regardless of any *prima facie* presumption which
might be given to the acknowledgment aforesaid, the con-
clusion above stated that the evidence in the case before us
establishes the fact that the grantor did not intend to de-
liver the supposed deed in his life time, renders it impossi-
ble that there was a delivery so as to enable it to take effect
as a deed. This appears from the above cited authorities
and will further appear from the authorities mentioned
below.

The following is said on the subject in the opinion of the
New York court delivered by Daniels, J., in *Fisher* v. *Hall,*
41 N. Y. 416, 421: "It is not necessary that the grantee or
his agent or servant should be present at the execution, in
order to have such a delivery of the instrument made as will
give it operation, validity and effect. But it is necessary
that it should be placed within the power of some other per-
son for the grantee's use, or that the grantor shall unequivo-
cally indicate it to be his intention that the instrument shall

take effect as a conveyance of the property, in order to have it produce that effect. The mere subscribing and sealing, accompanied with the ordinary attestation of those acts by the witnesses * * * followed by the grantor keeping the deed in his own custody, and his continued possession of the premises, are not sufficient to constitute a legal delivery of a sealed instrument * * *. A rule of law by which a * * * deed executed by the grantor, afterwards retained by him during his life, in his own exclusive possession and control, never during that time made known to the grantee, and never delivered to any one for him, or declared by the grantor to be intended as a present operative conveyance, could be permitted to take effect as a transmission of the title, is so inconsistent with every substantial right of property as to deserve no toleration whatever from any intelligent court, either of law or equity."

As held, per syllabus, in the case of *Gaines* v. *Keener*, 48 W. Va. 56, 35 S. E. 856: "Where a deed was executed and acknowledged ready for delivery, but it was not delivered by anything then said or done, was laid away in decedent's chest, among his private papers, although the grantees in said deed may have carried the keys and had access to the chest, some act or word indicating the grantor's intention to deliver said deed to them was necessary to constitute a delivery of the same, and make it effectual as a conveyance of the property described to the grantees."

In *Lang* v. *Smith*, 37 W. Va. 725, 17 S. E. 213, the deed was signed sealed and duly acknowledged before justices of the peace with the certificate of acknowledgment in due form attached, ready for delivery, but it was not delivered by anything said or done at the time of the execution or acknowledgment of it and it was laid away in the grantor's drawer where he kept his papers, together with his will executed at the same time. After the grantor's death the supposed deed and will were found in the said drawer. The

court held that the deed was never delivered. In the opinion of the court the following is said: "Where (as in this case) an acknowledged deed is retained by the grantor, it depends on his intention at the time, whether the acknowledgment is a complete execution of the deed. Such intention may be ascertained by evidence of his previously declared purpose, though such intention is not indicated at the time of the acknowledgment." In another part of the opinion it is said: "In this case the deed in question was executed, ready for delivery, but the power of dominion over the deed was not parted with by anything said or done. It was laid away in the decedent's drawer, * * * it was but ambulatory, not legally fixed or settled, past destruction or alteration. It is nothing more than a will defectively executed and void under the statute. The grantor died without parting with his possession of the deed or of his right of control over it. It was not delivered during his life, and after his death no one had the power, express or implied, to deliver it."

In *Lawn* v. *Donovan*, 2 Kan. App. 404, 42 Pac. 744, it was held that there was no delivery of a deed duly executed and acknowledged by the grantor found in his possession at the time of his death accompanied by a letter requesting that it be given after his death to the person named in the deed as grantee. The court in its opinion said: "The delivery must * * * be complete during the life of the grantor;"— (meaning so far as the acts of the grantor are concerned). "There can be no delivery by a dead hand. When a deed is found in the possession of the grantor at the time of his death, the presumption of the law is that it was not delivered; and this presumption becomes conclusive in the absence of evidence showing that a delivery had actually been made."

"All authority to deliver the deed is removed after the grantor's death where delivery during his lifetime has not been made either to the grantee or to some one for his benefit." 1 Devlin on Deeds, section 260-a at p. 377.

"Where the grantor without the wife's knowledge placed a deed in a tin box among his private papers in a wardrobe used by himself and wife, in which place it was found after his death, there was no delivery." *Idem.*

[8] Even if the supposed deed involved in the case before us could be regarded as evidencing a voluntary settlement and the strong presumption of .delivery of the deed which obtains in such cases could be said to exist, (*Souverbye* v. *Arden*, 1 Johns. Ch. (N. Y.) 240; *Bunn* v. *Winthrop, Idem* 329); still, that presumption is but a *prima facie* presumption; delivery of a deed of voluntary settlement is as essential to its validity as is the delivery of any other deed; and the acts of a grantor which are essential to a delivery must be performed in his lifetime, as aforesaid (8 R. C. L. section 69, pp. 1009-1010; *Payne* v. *Payne, supra*). And, as we have seen, the circumstances in the case before us negative and overcome any presumption that a delivery was intended or was made by the supposed grantor in his lifetime.

[9, 10] In the case before us the deed, as we shall presently see, was supported by a valuable consideration and we would give it effect as a contract to convey if we could do so in accordance with principle and what we consider the correct view taken by the authorities. But on this subject the authorities hold that such effect is given to an undelivered deed only where there is some evidence *aliunde* that there was a meeting of the minds of the grantor and grantee in a completed contract, the terms of which are expressed in the deed; and this we think the correct view on principle. *Chiles* v. *Bowyer;* 127 Va. 249, 103 S. E. 619, and authorities cited. In the case before us there is no *aliunde* evidence whatsoever of such a contract to convey as is expressed in the terms of the deed in question. Moreover the deed cannot be supported as a contract to convey by the implied or constructive contract which is involved in the implied or constructive trust which arises in the case, as we

3

hold below, for the reason that the terms of the contract expressed in the deed are very different from the terms of the contract or trust which the law implies or raises in such case.

We think, therefore, that there was no error in the decrees under review in the holding that the writing in question was never delivered so as to become operative and effectual as a deed.

[11, 12] 2. Was the land involved in this case impressed with a trust in favor of Mrs. Castle in her lifetime and the Mumpower heirs to the extent of undivided interests in proportion to the shares of the purchase price which were paid with their property?

This question must be answered in the affirmative.

As appears from the statement preceding this opinion the evidence in the case establishes beyond a reasonable doubt that all of the purchase money for the land involved was paid with property belonging to Mrs. Castle and the Mumpower heirs, except two sheep, two hogs, and perhaps $5.00 in the value of a calf which possibly may have been paid by Wm. A. Castle. But as to this $5.00 the preponderance of the evidence is against the inference that such $5.00 was so paid. In view of the character of the evidence on the subject of there having been a prior agreement that the title to the land was to be taken in the name of Mrs. Castle and her children, depending as such evidence does on the uncertain memory of a witness of a conversation which took place some thirty years previously to his testifying, it may be left in doubt whether there was in truth such an express agreement. But whether there was or was not such an express agreement is immaterial to the conclusion which we must reach from the firmly established facts aforesaid with respect to the ownership of the property which was used to pay for the land. The fact being that the relationship of the parties was not such that there was any legal or moral

obligation on the wife or the Mumpower descendants to make any gift or advancement to Castle, and there being no evidence even tending to show that there was in fact any gift to him, a trust arose by operation of law, in favor of the owners of such property other than Wm. A. Castle, from the mere fact of such use of their property. It was an "implied trust," accurately speaking, in accordance with 2 Minor's Inst. (3rd ed.) p. 217, or a species of "resulting trusts," as classed by 3 Pomeroy's Eq. Jur. (3rd ed.) sections 1031, 1037, of the second type of such trusts there mentioned, if there was no prior agreement between Castle and wife that the title to the land was to be taken in the names of the wife and her children. It was a "constructive trust," if there was such an agreement, making the taking of the title in his name by Wm. A. Castle tortious. 3 Pomeroy's Eq. Jur. section 1044, 1039; 2 Minor's Inst. pp. 219-220, 222. In the one case, there arises from the facts a presumed intention on the part of Wm. A. Castle to hold and a presumed holding by him of the legal title to the land in trust for the *cestui que trust* aforesaid; in the other case, equity, because of the facts, raises the same trust, regardless of the intention of such holder of the legal title.

[13] The fact that the *cestui que trust* aforesaid did not pay the whole price for the land does not affect the trust in their favor to the extent that they did pay the purchase price. As said in 3 Pomeroy's Eq. Jur. section 1038, at pp. 1995-6; "A trust also results in favor of one who pays only a part of the price, in other words, where two or more persons together advance the price, and the title is taken in the name of one of them, a trust will result in favor of the other in respect to an undivided share of the property proportioned to his share of the price. The doctrine in all of its phases applies alike to personal and to real property."

We are therefore of opinion that there was error in the decrees under review in not holding in accordance with the

views we have above expressed upon the question, last above stated, and for that reason the decrees must be reversed.

We are of opinion that Wm. A. Castle owned at his death and that from him descended to the Castle children an undivided interest in the land in suit which bears the same proportion to the whole land which the value of the two sheep and two hogs owned by him as aforesaid, bore to the value of the two horses, one heifer, seven sheep and two calves owned by Mrs. Castle and the Mumpower descendants as aforesaid; and that such undivided interest descended to the Castle heirs upon the death of Wm. A. Castle; that of the remaining undivided interest in such land the Mumpower heirs own two-thirds; that the other third of such undivided interest in the land belonged to Mrs. Castle at her death and descended upon her death to both the Castle children and the Mumpower heirs, the latter taking *per stirpes;* and we shall decree accordingly. To be strictly accurate the calf owned by Mrs. Castle alone, which entered into the purchase of the ten-acre parcel of land as aforesaid, would slightly change the above mentioned proportions of the undivided interest of Mrs. Castle and the Mumpower heirs, but to so slight a degree that it may be regarded as being *de minimis.* And there not being sufficient evidence before us from which to fix the proportionate values aforesaid, we leave such proportion to be fixed by agreement of the parties or by the court below upon further evidence which may be taken on that subject in the further progress of the case. Such values should be fixed as of the times the property was used in the purchase of the land.

*Reversed and remanded.*